**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| GAYATRI SRINIVAS, A. CISNEROZ, TERISHA TAYLOR, MELISSA SHARP, CAITLIN CORDOVA, and RACHEL WALKER on behalf of themselves and all others similarly situated,<br><br>             Plaintiffs,<br><br>      v.<br><br>AMAZON.com, Inc.,<br><br>             Defendant. | Case No. 2:26-cv-01199<br><br>**FIRST AMENDED COMPLAINT—CLASS ACTION**<br><br>**JURY DEMAND** |

FIRST AMENDED CLASS ACTION COMPLAINT

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

Plaintiffs Gayatri Srinivas, A. Cisneroz, Terisha Taylor, Melissa Sharp, Caitlin Cordova, and Rachel Walker ("Plaintiffs"), on behalf of themselves and all others similarly situated, allege as follows:

## I.   <u>INTRODUCTION</u>

1.   Plaintiffs assert these claims on behalf of themselves and a class of female employees who experienced systemic discrimination by Defendant Amazon.com, Inc. ("Amazon" or "Defendant").

### A.   Summary of Claims

2.   Plaintiffs seek to represent a class of women who worked for Amazon in Job Levels 4-8 ("Covered Positions") to challenge Amazon's failure to compensate women equally to similarly situated men and denial, on the basis of gender, of the same advancement opportunities for women that it makes available for men.

3.   Plaintiffs Srinivas and Cisneroz seek to represent a class of all women who worked for Amazon in Covered Positions in Washington at any time from three years before the filing of the initial complaint through the resolution of this action (the "EPOA Liability Period" or "Washington Liability Period") (collectively, the "Washington Class").  Plaintiffs are members of the Class they seek to represent.

4.   Plaintiffs Taylor and Sharp seek to represent a class of all women who worked for Amazon in Covered Positions in California at any time from three years before the filing of the initial complaint, with a six-year recovery period, through the resolution of this action (the "California EPA Liability Period" or "California Liability Period) (collectively, the "California Class").  Plaintiffs are members of the Class they seek to represent.

5.   Plaintiffs Cordova and Walker seek to represent a class of all women who worked for Amazon in Covered Positions in New York at any time from six years before the filing of the

FIRST AMENDED CLASS ACTION COMPLAINT  Page 1

initial complaint through the resolution of this action (the "New York EPL Liability Period" or "New York Liability Period") (collectively, the "New York Class").  Plaintiffs are members of the Class they seek to represent.

6.    This class action is brought against Defendant Amazon to challenge its systemic discrimination against its female employees.

7.    Throughout the period covered by this case and throughout its corporate workforce in Washington, California, and New York, Amazon has systematically paid women less than men performing substantially similar work and has limited women's employment opportunities on the basis of gender.

8.    Amazon accomplishes this unlawful discrimination by assigning women to lower-paying jobs and paying women less for the same jobs, despite similar qualifications and tenure.

9.    Amazon has developed a comprehensive, corporate-wide job classification system, reflected in its Leveling Guidelines, to define job roles and structure its job architecture for its corporate employees.  Within that classification system, Amazon regularly assigns women to lower-paying, less favorable Job Codes and Job Families and assigns higher-paying Job Codes to men doing substantially similar work, with similar qualifications, experience, and tenure. Amazon also regularly segregates men and women by Job Code, assigning men to higher-paying "tech"-labeled positions and women to lower-paying equivalent positions labeled as non-"tech." Despite this Job Code segregation, Amazon assigns women to perform substantially similar work to men with equivalent Job Codes, often working side-by-side or on the same teams, with higher-paid men.  As a result, Amazon both underpays women and limits their career advancement opportunities based on gender.

10.    Amazon also underpays women by under-leveling them and paying them less than men within the same level.  Under Amazon's job classification system, it regularly assigns

FIRST AMENDED CLASS ACTION COMPLAINT  Page 2

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

women to lower Job Levels than men, and, within the same Job Level, it pays women less than men. Even where Amazon assigns men and women the same Job Code, which is purportedly a more refined indicator of the nature of an employee's work under Amazon's classification system, Amazon systematically pays women less than men within that same pay band.

11. Amazon's failure to pay women and men equally for performing substantially similar work is not justified by any lawful reason.

12. As described more fully below, Amazon's practice of paying women less than men doing substantially similar work is systematic, consistent, and pervasive throughout its corporate workforce. The conduct complained of herein is referred to collectively as Amazon's "Compensation Practices." Amazon's Compensation Practices are the result of policies and practices.

13. Plaintiffs allege, on a class-wide basis, that Amazon has discriminated against them and all Washington Class members, California Class members, and New York Class members by paying them less than comparable men and limiting their and similarly situated women's career advancement opportunities on the basis of gender, in violation of the laws of Washington, California, and New York – specifically, the Washington Equal Pay and Opportunities Act, RCW 49.58.010 *et seq.* ("EPOA"); the California Equal Pay Act, Cal. Lab. Code §§ 1197.5 ("California EPA"); the California Fair Employment and Housing Act ("FEHA"); and the New York Equal Pay Law, as amended, N.Y. Lab. L. Art. 6, § 194 ("New York EPL") (collectively, the "Class Claims").

14. Plaintiffs also allege, on an individual basis, that Amazon has discriminated against them by paying them each less than comparable men in violation of the Federal Equal Pay Act ("EPA"), 29 U.S.C. § 206 *et seq*.

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

**B.**     **The Related *Wilmuth* Class Action**

15.     Plaintiffs' class claims are premised on substantially the same facts and law as the Washington Class claims alleged in the related action, *Wilmuth et al. v. Amazon.com, Inc.*, No. 23 Civ. 01774, and the California and New York Class claims alleged in the proposed Second Amended Complaint in *Wilmuth*.  These class actions are being jointly prosecuted, and all Plaintiffs in both actions have stipulated to consolidating the cases.

**II.     PARTIES**

16.     Plaintiff **Gayatri Srinivas** is a woman residing in King County, Washington.  She started as an L5 Technical Writer in Amazon's Amazon Web Services ("AWS") organization in 2011 and was promoted to an L6 Senior Technical Writer in 2016.  In or around 2021, Plaintiff Srinivas became a "tech" classified L6 Technical Writer in the Technical Documentation job family.  She left Amazon in April 2025.

17.     Plaintiff **A. Cisneroz** is a woman residing in King County, Washington.  She worked as an L7 Principal Product Manager within Amazon's Fashion and Personalization organization between 2022 and 2024.

18.     Plaintiff **Terisha Taylor** is a woman residing in San Diego County, California. She started as an L5 Area Manager in Amazon's Operations organization in 2018.  Following a short stint as an L5 Launch Manager in 2020, Plaintiff Taylor became an L6 Launch Senior Manager from 2021 until 2025.

19.     Plaintiff **Melissa Sharp** is a woman residing in Riverside County, California.  She worked as an L5 Curriculum Developer in Amazon's AWS organization between 2022 and 2025.

20.     Plaintiff **Caitlin Cordova** is a woman residing in Orange County, New York. She started working at Amazon in the AWS organization as an L5 Program Manager in 2018 and is

FIRST AMENDED CLASS ACTION COMPLAINT  Page 4

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

now an L6 Individual Contributor Product Manager.

21.    Plaintiff **Rachel Walker** is a woman residing in New York County, New York. She worked for Amazon as an L5 Construction Manager from January 2022 until October 2025.

22.    Defendant **Amazon.com, Inc.** is a Delaware corporation headquartered in King County, Washington, and doing business throughout Washington State and the United States.

23.    Amazon is an "employer" subject to Washington, California, and New York statutes governing equal pay, including the EPOA, the California EPA, the New York EPL, the  New York State Human Rights Law, and the New York City Human Rights Law, and Amazon is specifically an employer of all Plaintiffs and Class Members for purposes of the laws identified herein.

## III.    <u>JURISDICTION AND VENUE</u>

24.    This Court has original subject matter jurisdiction over the federal EPA claims pursuant to 28 U.S.C. § 1331 and Sections 206(d) of the Fair Labor Standards Act, 29 U.S.C. § 206(d).

25.    This Court has supplemental jurisdiction over the Washington, California, and New York state law claims under 28 U.S.C. § 1367, because they arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims as to form part of the same case or controversy under Article III of the United States Constitution.

26.    This Court has diversity jurisdiction over the California state law claims under 28 U.S.C. § 1332(a)(1) because Plaintiff Taylor, Plaintiff Sharp, and Amazon are citizens of different states—Plaintiffs Taylor and Sharp are citizens of California and Amazon is a citizen of Delaware and Washington State—and the amount in controversy exceeds $75,000.

27.    This Court has diversity jurisdiction over the New York state law claims under 28 U.S.C. § 1332(a)(1) because Plaintiff Cordova, Plaintiff Walker, and Amazon are citizens of

FIRST AMENDED CLASS ACTION COMPLAINT  Page 5

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

different states—Plaintiffs Cordova and Walker are citizens of New York and Amazon is a citizen of Delaware and Washington State—and the amount in controversy exceeds $75,000.

28. This Court also has original jurisdiction over the class claims under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  This is a putative class action in which there are 100 or more members in the proposed Classes, at least some members of the proposed Classes have a different citizenship from Defendant, and the claims of the Classes exceed $5,000,000 in the aggregate.

29. This Court has personal jurisdiction over Amazon because the company does business in this District and because some of the acts complained of, and giving rise to the claims alleged, occurred in and emanated from this District.

30. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District.

31. Plaintiff Srinivas was a resident of King County, Washington throughout her employment by Amazon.

32. Amazon employed Plaintiff Srinivas in King County, Washington throughout her employment with Amazon.

33. Plaintiff Cisneroz was a resident of King County, Washington throughout her employment by Amazon.

34. Amazon employed Plaintiff Cisneroz in King County, Washington throughout her employment with Amazon.

35. Plaintiff Taylor was a resident of Riverside County, California (January 2018 to June 2022); Galveston County, Texas (August 2022 to October 2024); or San Diego County, California (October 2024 to March 2025) throughout her employment with Amazon.

36. Amazon employed Plaintiff Taylor in Riverside County, California (January 2018

FIRST AMENDED CLASS ACTION COMPLAINT  Page 6

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

to June 2022); and as a remote employee working primarily from her homes in Galveston County (August 2022 to October 2024) and San Diego County (October 2024 to March 2025), or Amazon office locations near those homes.

37.    Plaintiff Sharp was a resident of Riverside County, California throughout her employment.

38.    Amazon employed Plaintiff Sharp in Moreno Valley, California, throughout her employment with Amazon.

39.    Plaintiff Cordova was a resident of Essex County, New Jersey (November 2018 to August 2020), or Orange County, New York (August 2020 to the present).

40.    Amazon employed Plaintiff Cordova in a virtual location in Essex County, New Jersey (November 2018 to August 2020); a virtual location in Orange County, New York (August 2020 to June 2022); Hudson County, New Jersey (June 2022 to March 2023); or New York County, New York (March 2023 to the present).

41.    Plaintiff Walker was a resident of Cook County, Illinois (January 2022 until July 2024) and New York County, New York (July 2024 to the present) throughout her employment at Amazon.

42.    Amazon employed Plaintiff Walker in Cook County, Illinois (January 2022 until July 2024) and New York County, New York (July 2024 to October 2025).

43.    The events, acts, and omissions giving rise to Plaintiffs' claims alleged herein occurred primarily in King County, Washington; Riverside County, California; San Diego County, California; New York County, New York; and Orange County, New York.

44.    Any and all prerequisites to the filing of this suit have been met.

IV.    **ADMINISTRATIVE PROCEDURES**

45.    Plaintiffs Taylor and Sharp have each filed a Complaint of Discrimination with

FIRST AMENDED CLASS ACTION COMPLAINT  Page 7

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

the California Civil Rights Department ("CRD").

46.    On November 7, 2025, the CRD issued a Right to Sue notice for Plaintiff Taylor.

47.    On June 17, 2026, the CRD issues a Right to Sue notice for Plaintiff Sharp.

## V.    COMMON FACTUAL ALLEGATIONS

### A.    Under Amazon's Common Job Architecture, Amazon Assigns Women to Lower-Paying and Less Favorable Job Codes and Pays Women Less Within the Same Job Codes.

48.    Amazon has systematically paid and continues to pay female employees lower compensation than it has paid and continues to pay men performing substantially similar work.

49.    As further described herein, Amazon has maintained and continues to maintain a centrally determined and uniformly applied job architecture, which uses a consistent framework throughout the corporate workforce to classify and compare jobs, including into Job Families, Job Levels, and Job Codes.  Under this common job architecture, Amazon labels certain Job Codes as "tech" positions and others as "non-tech," purportedly based on whether a job requires some minimal skill in technology, science, engineering, or math.  The "tech" labeling does not render the Job Code substantially dissimilar.  It does not correspond to any specific computer coding competency or function.  Within this job architecture, Amazon pays women less than men performing substantially similar work, including by assigning men to "tech"-labeled positions, which are typically compensated at higher levels.

50.    While Amazon assigns women to lower-paying Job Codes throughout its corporate workforce, including in Washington, California, and New York, it still requires women to perform substantially similar work to men in higher-paying Job Codes, including "tech"-labeled jobs.

51.    As Plaintiffs experienced, Amazon even assigns women in non-"tech"-labeled positions and men in "tech"-labeled positions to perform substantially the same tasks on the

FIRST AMENDED CLASS ACTION COMPLAINT  Page 8

same teams, and still pays women less for that work. For example, Amazon assigned Plaintiff Cisneroz a non-technical Principal Product Manager job code, but Amazon assigned a man performing substantially similar work on her team and/or within her organization a Principal Product Manager-Technical job code. Because Amazon provides for a significantly higher salary scale for technical Product Managers, like it does across the board for its "tech"-labeled positions versus non-"tech"-labeled positions—even at the same Job Level—Amazon paid Plaintiff Cisneroz less total compensation than her male counterpart. Upon information and belief, female employees throughout Amazon are routinely assigned similar but lower-compensated Job Codes.

52.    As a direct result of assigning women to non-"tech"-labeled roles, as well as Amazon's steering of women into Job Codes with fewer career growth opportunities, Amazon also limits female employees' career advancement opportunities. Amazon makes it challenging for women to transfer from a non-"tech" role into the more favorable and more highly compensated equivalent "tech" roles, and also makes it more challenging for women to transition from their current Job Code and Job Level into more highly-paying Job Codes and Job Levels, through transfers and/or promotions. Women's advancement opportunities at Amazon are thus frequently constrained by assignment to less favorable non-"tech" roles and/or other Job Codes with limited career growth opportunities.

53.    Amazon also pays women less than men within the same Job Level and even within the same Job Code.

54.    Under its job classification system, Amazon also designates certain employees as "managers" and others as "independent contributors," and Amazon pays individuals classified as "managers" more. These labels do not correspond to whether an employee supervises others, as "independent contributors" regularly have numerous direct reports and perform similar work as

FIRST AMENDED CLASS ACTION COMPLAINT  Page 9

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

those labeled "managers."  Amazon regularly assigns women to lower-paying "independent contributor" roles and men to higher-paying "manager" roles, despite them performing similar work.

55.    Assigning women to jobs with "independent contributor" labels likewise limits their career advancement opportunities, including their opportunities for promotion.

56.    At all relevant times, Amazon has known or should have known of the pay disparity between women and comparable men, yet Amazon has taken no action to remedy the unequal compensation between women and similarly situated men.  Amazon's failure to pay women the same compensation paid to men for substantially similar work has been and is willful.

**B.    Under Amazon's Unitary Operations, Centralized Decisionmaking, and Uniform Policies, Amazon Employees Frequently Transfer Between Job Families, Teams, and Job Codes.**

57.    Amazon is among the world's largest e-commerce and technology companies and is continually expanding into new sectors.

58.    Since its inception in 1997, and especially as the company has grown and expanded, Amazon prides itself on instilling a common culture and set of guiding principles for every employee, regardless of their team or location. As a result, Amazon employs a highly scaled and focused hierarchy with rigid top-down principles that govern its job architecture and compensation.

59.    The company has a strong, consistent culture centered on Amazon's "16 Leadership Principles," described by former Amazon employee Kristi Coulter as the "Amazon Commandments: a set of values and behaviors that show up everywhere from hiring loops to performance reviews to routine team meetings."  Kristi Coulter, *Exit Interview*, 17 (2023).  The Leadership Principles drive Amazon's corporate strategy and culture, including its philosophy of

FIRST AMENDED CLASS ACTION COMPLAINT Page 10

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

managing the employee experience, and exemplify Amazon's emphasis on policies and practices that maximize its ability to constantly scale up.

60.    That uniform approach has resulted in strong consistency in employment practices, achieved in part through standard corporate-wide structures, policies, and practices. For example, Amazon has built and maintains centralized human resources ("HR") structures and processes.  Thus, Amazon's job architecture, hiring and onboarding processes, compensation determinations, performance measurement systems, and promotion decisions are highly standardized.  The consistency also carries through to day-to-day work through the Leadership Principles.  Throughout the company, regardless of a given employee's Job Code, team, level, organizational location, or geographic location, Amazon expects each employee to exemplify and abide by—and analyzes their performance based on—these 16 Leadership Principles.

61.    Amazon also employs a highly structured and systematized work environment that allows employees to work interchangeably and frequently move between teams.  Kristi Coulter calls this movement of interchangeable employees "Amazon Boggle." *Exit Interview* at 108.  Amazon maintains a common internal transfer process to transfer employees from one role or team to another, which often involves changing from one Job Code to a different Job Code, and can involve transferring from a non-"tech"-labeled position to a "tech"-labeled position. There are many Job Families within Amazon within which employees frequently and recurrently transfer from one Job Family to another because the Job Families are similar and the jobs under either Job Family are substantially similar.

62.    Teams commonly include employees from multiple different cities, and even different countries.

63.    Amazon's job postings also reflect the cohesive, cross-geographic nature of Amazon's workplace.  Amazon postings often explicitly note that the role can be fulfilled out of

FIRST AMENDED CLASS ACTION COMPLAINT  Page 11

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

any of multiple offices.

64. Similarly, employees' primary HR contacts are frequently located in different states from the employees.

65. Amazon's 2023 10-K Report filed with the SEC reports employment information for the whole company, on behalf of all subsidiaries, without distinguishing between them.[1] Specifically, Amazon states that "[a]s of December 31, 2023, we employed approximately 1,525,000 full-time and part-time employees."[2] Upon information and belief, there are no 10-K Reports for any individual Amazon subsidiary or entity.

66. Similarly, Amazon describes itself to the EEOC in its yearly EEO-1 Employer Information Reports as a unitary company, with "Amazon.com, Inc." as the sole employer of record.[3] Amazon's 2021 EEO-1 submission to the EEOC lists 1,120,602 total workers, of whom 761,568 are "laborers & helpers," 65,123 are listed in one of two categories of "officials & mgrs," 121,182 are "professionals," and the rest are listed in various other categories. Upon information and belief, Amazon does not create or submit separate EEO-1 Reports for its subsidiaries or any other entity.

67. On its website, Amazon consistently describes itself as a unitary company. For example, on a web page titled "Our workforce data," Amazon states, "we will continue to strive for better representation across our *company*," followed by several graphs describing demographics for the whole company, without distinguishing between subsidiaries, geographic

---

[1] *See* Form 10-K – Amazon.com, Inc., U.S. Securities & Exchange Comm'n (Feb. 1, 2024) at 4, https://d18rn0p25nwr6d.cloudfront.net/CIK-0001018724/c7c14359-36fa-40c3-b3ca-5bf7f3fa0b96.pdf (last accessed Feb. 8, 2024).

[2] *Id.* at 42.

[3] *See* 2021 EEO-1 Report, https://assets.aboutamazon.com/ff/dc/30bf8e3d41c7b250651f337a29c7/2021-amazon-consolidated-eeo-1-report-2p.pdf (last accessed Feb. 8, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT  Page 12

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

locations within the United States, or departments.[4]

### C. Amazon Maintains Common Decisionmaking and Uniform Policies as to Hiring and Promotions.

68.    Amazon has a centralized HR department which implements and dispenses all of Amazon's personnel processes, including hiring, Job Code and Level assignments, promotion, and job evaluations, all of which impact Amazon employees' compensation.

69.    Amazon ensures that each corporate employee goes through a hyper-standardized hiring process, regardless of the role, to determine if the employee is a good fit, not only for a specific role, but also for Amazon's culture.

70.    Candidates who make it past Amazon's initial screening complete a "full hiring loop," during which they participate in multiple interviews with panels of Amazon employees.

71.    For every hiring loop, Amazon assigns a "Bar Raiser," which is a "trained and trusted interviewer who sits in on meetings to evaluate candidates across the company for 'culture fit.'" Kristi Coulter, *Exit Interview*, at 148.  The Bar Raiser sits in on every interview in the hiring loop, contributes feedback on the candidate, and joins the subsequent decisionmaking conversations.  Bar Raisers are designed to play a two-part role: (a) to ensure the candidate meets the baseline qualifications for the Job Family and Level, and (b) to ensure the candidate is a good "culture fit" for Amazon.  To ensure standardization in the company, Amazon generally requires that Bar Raisers come from outside the team doing the hiring.  Amazon puts Bar Raisers through special training to train them for the role.  Amazon relies on each Bar Raiser to participate in hundreds of hiring loops.[5]

72.    In addition to the careful use of Bar Raisers, Amazon requires *all* employees who

---

[4]    *Our workforce data*, Amazon.com, https://www.aboutamazon.com/news/workplace/our-workforce-data (last accessed Feb. 8, 2024) (emphasis added).
[5]    Kristi Coulter, *Exit Interview* at 148 (2023).

FIRST AMENDED CLASS ACTION COMPLAINT Page 13

participate in interview loops to go through the same mandatory training called Making Great Hiring Decisions ("MGHD"). Through the MGHD training, Amazon teaches employees its unique process for interview loops—down to the exact questions interviewers must ask. Amazon instructs interviewers to draw their questions from the Amazon Interview Question Bank ("AIQB"), with specially designed questions intended to make sure, regardless of the particular job role, team, or location, that the employee is the right "fit."

73.     The heart of every question asked in the hiring loop—and the metrics by which the candidates are judged—is Amazon's "16 Leadership Principles." Amazon credits "employ[ing] Amazon's leadership Principles every day" as a key to its success. Daniel Slater, the Worldwide Head of Culture of Innovation at Amazon Web Services describes it as the "primary reason" why, "as the company scaled," Amazon has retained its ability to "maintain [its] culture of innovation."[6] Amazon expects employees at all levels of the company to consciously embody these Principles on a day-to-day basis. The Principles are a "common vernacular" across the entire company.[7] The Principles are "embedded in [Amazon's] hiring processes: we give them to candidates prior to their interview, and evaluate their examples by how their decisionmaking and problem-solving demonstrates different Leadership Principles."[8]

74.     Amazon generally assigns each interviewer on a given loop one or two specific Leadership Principles as their focus. Their role in the interview is only to ask candidates about that specific Principle and to provide written feedback on how the candidate responds.

75.     Amazon consistently uses this uniform hiring process for corporate applicants and

---

[6]     Daniel Slater, *Leading and Innovating with Leadership Principles*, https://aws.amazon.com/executive-insights/content/leading-and-innovating-with-leadership-principles/ (last accessed June 10, 2026).
[7]     *Id.*
[8]     *Id.*

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

evaluates their candidacy by the same metrics.

**D.      Amazon Maintains Common Decisionmaking and Uniform Policies as to Its Job Architecture.**

**1.      The Job Architecture**

76.      As described below, Amazon has created a rigid job architecture intended to provide a framework for the organization of its employees.  Each Job Code (the work an employee functionally performs) falls within a larger Job Family (comprised of multiple related job codes).  Separately, individuals are assigned a Job Level that is intended to reflect their education, experience, and skills.  The intersection of an individual's Job Level and Job Code determines their compensation.  Amazon uses a single set of job coding/leveling structures throughout the company, across its locations, referred to as the "Leveling Guidelines."  Whether an employee is in Washington, California, New York, or elsewhere, the same job architecture/Leveling Guidelines apply.

**2.      Job Families**

77.      Amazon places each employee within a "Job Family" based on their job responsibilities.  Employees frequently transfer between Job Families, as many Job Families share related work and responsibilities.  Employees assigned to different Job Families regularly work on the same teams and perform similar work.

**3.      Job Levels**

78.      Amazon's HR, in conjunction with Bar Raisers, assigns each corporate salaried employee a Job Level from Level 4 (at the bottom) to Level 12 (at the top) based on a centralized rubric that defines the characteristic of each level in connection with a given Job Code.

79.      Amazon strictly controls Job Level assignments.  Managers do not have discretion to change an employee's Job Level.  If a Manager wishes to change the Job Level for a direct report within the first six months of employment, they must do so by appealing to the Bar Raiser

FIRST AMENDED CLASS ACTION COMPLAINT Page 15

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

who had been on the employee's hiring panel.  Otherwise, a Manager has to wait at least one year and then put the employee up for promotion in order to raise their level.

### 4.    Job Codes

80.    Amazon assigns each employee a "Job Code," which indicates the work to be performed and job qualifications, based on a range of Job Codes available for the specific Job Family.

81.    Amazon's HR, in conjunction with Bar Raisers, assign Job Codes based on Amazon's Leveling Guidelines.

82.    Managers do not have discretion to change an employee's Job Code.  If managers believe a Job Code is incorrect, they must ask Amazon's HR to conduct a Job Code review.

83.    Amazon maintains company-wide Leveling Guidelines governing both Job Levels and Job Codes.

84.    As with Job Families, employees frequently transfer between Job Codes, as many Job Codes share related work and responsibilities.  Employees assigned to different Job Codes regularly work on the same teams and perform similar work.

85.    Amazon labels some Job Codes as "tech" and others as "non-tech," and typically pays "tech"-labeled Job Codes more than "non-tech"-labeled Job Codes.

86.    Once an employee begins working at the company, it is rare for Amazon to change an employee's Job Code, even if (as regularly occurs) the employee's job duties grow and evolve or the employee's organization is reorganized to add additional Job Codes.  Instead, employees typically change Job Codes through an internal job transfer pursuant to Amazon's common internal transfer process or through a promotion.  When a manager changes an employee's Job Code, it requires both HR and the employee's skip-level manager to sign off.

87.    As a result, upon information and belief, employees within one or more related

FIRST AMENDED CLASS ACTION COMPLAINT Page 16

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

Job Families regularly perform substantially similar work to each other even if they have different Job Codes.

### E. Amazon Maintains Common Decisionmaking and Uniform Policies as to Its Compensation.

88. Across the company, Amazon employees' primary compensation is a combination of a base salary and stock grants (and, for their first two years of employment only, cash bonuses), which are directly based on the employee's Job Level and Job Code.

89. At hire, compensation is determined based on a range associated with the Job Code and Job Level assigned by Amazon's HR. Later, Amazon determines employees' compensation using a single automated algorithm. An employee's Job Level, Job Family, and performance rating (discussed further below) are input into the algorithm, and the algorithm produces a recommended compensation. Although managers can lobby HR to request a departure from the algorithm's recommendation, it is unusual for Amazon to authorize any such changes.

### F. Amazon Maintains Common Promotion Processes, Including Standardized Metrics, Application Processes, and Timelines.

90. Amazon also maintains a uniform promotion process applicable to all employees. Within the Leveling Guidelines, Amazon provides metrics for what should be expected of employees at each Job Level, as well as separate Job Code-specific metrics for each Job Level. Amazon uses both metrics to guide promotion decisions.

91. There are two promotion cycles each year for levels L7-L10 and four promotion cycles for levels L4-L6, following predetermined timelines. Amazon requires managers to submit a standardized promotion document, following templates and guidance available for all employees.

92. The promotion document includes the employee and/or manager's written self-assessment of their "skills and experience against the official HR requirements for" the Job Level

FIRST AMENDED CLASS ACTION COMPLAINT Page 17

the employee seeks. *Exit Interview* at 216. "Amazon promotion proposals are dense, data-packed documents." *Id.*

93.    Amazon does not allow employees to be promoted outside of the bi-annual or quarterly promotion process. That applies to internal transfers as well. Amazon does not afford discretion to its managers to promote employees. Employees cannot be promoted up a level by being offered a new role through an internal job posting for an open position at a higher level. Thus, for example, if a Level 6 employee applies for and is offered a job scoped to be Level 7 on a different team, the employee can accept the role and change teams, but they will not be promoted to or paid as a Level 7, even if they perform all of the Level 7 job duties. If the employee wants the promotion to Level 7, they must seek it through the standardized promotion process. Amazon requires an employee to have been in their current role for at least one, often two, years before they are permitted to seek a promotion to a higher level.

G.    **Amazon Maintains Common Evaluation Processes, Including Forced Ranking, and "Unregretted Attrition Goals" to Meet Termination Quotas.**

94.    Amazon uses the same processes for employee evaluations and promotion decisions nationwide, regardless of location or organization.

95.    During the annual performance evaluation cycle, Amazon gives each employee two numerical scores: (a) a rating of performance from 1 to 7, and (b) a rating of potential from 1 to 4. Higher numbers are better. Amazon then combines those two scores to determine one of five final ratings: (a) "Least Effective," (b) "Highly Valued 1," (c) "Highly Valued 2," (d) "Highly Valued 3," and (e) "Top Tier."

96.    Amazon imposes a forced ranking system that falls along a bell curve, constraining managers' discretion in the review process. Thus, a manager cannot give all their direct reports the highest score, and the manager must in fact give some employees the lowest score. This is true across all teams and locations.

FIRST AMENDED CLASS ACTION COMPLAINT Page 18

97. Low performance scores have a lasting impact on employees' compensation and eligibility for promotion. For example, Amazon instructs managers to put any employees who receive a Least Effective rating into the "Focus" program. Employees in Focus are not eligible for raises or stock grants. Further, Focus is typically a precursor to Pivot, which is the equivalent of a Performance Improvement Plan (PIP)—and often, to being fired. The forced ranking system and the consequences of low ratings help Amazon achieve its self-described "unregretted attrition goal." That goal is, effectively, a quota requiring a certain number of employees to be fired every year companywide, which Amazon does not "regret."

98. Upon information and belief, Amazon's common practice of paying women less than men for similar work cannot be explained by differences in performance review ratings, as can be demonstrated through common data analysis.

## VI.   CLASS ACTION ALLEGATIONS

99. Plaintiffs Srinivas and Cisneroz assert claims under the EPOA, Plaintiffs Taylor and Sharp assert claims under the California EPA and FEHA, and Plaintiffs Cordova and Walker assert claims under the New York EPL, New York State Human Rights Law, and New York City Human Rights Law, on behalf of the proposed Classes pursuant to Federal Rule of Civil Procedure 23.

100. Plaintiffs Srinivas and Cisneroz seek to represent the Washington Class, Plaintiffs Taylor and Sharp seek to represent the California Class, and Plaintiffs Cordova and Walker seek to represent the New York Class.

101. All requirements for class certification are met by the proposed Classes.

102. <u>Numerosity</u>. Class Members in the Washington Class, the California Class, and the New York Class are so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). Although Plaintiffs do not know the precise number of Class Members, the number

FIRST AMENDED CLASS ACTION COMPLAINT  Page 19

in each Class is far greater than can be feasibly addressed through joinder.

103.   Commonality.  There are questions of law and fact common to the Washington Class, the California Class, and the New York Class, and these questions predominate over any questions affecting only individual members.  Common questions include: (a) whether Amazon pays its female corporate employees less than male employees performing substantially similar work; (b) whether Amazon limits Washington-based, California-based, and New York-based female corporate employees' career opportunities based on gender; (c) whether Amazon's policies and practices violate the EPOA, the California EPA, FEHA, the New York EPL, the New York State Human Rights Law, and New York City Human Rights Law; and (d) whether compensatory damages, punitive damages, monetary equitable remedies, injunctive relief, or other relief is warranted.

104.   Typicality.  Plaintiffs' claims are typical of the claims of the Classes they seek to represent.

105.   Adequacy.  Plaintiffs will fairly and adequately represent and protect the interests of Class Members.  Plaintiffs have retained counsel competent and experienced in complex class actions, employment discrimination litigation, and the intersection thereof.

106.   Rule 23(b)(2) certification.  Class certification is appropriate under Rule 23(b)(2) because Amazon has acted and/or refused to act on grounds generally applicable to Class Members, making appropriate declaratory and injunctive relief with respect to Plaintiffs and the Class Members they seek to represent.  The Class Members are entitled to injunctive relief to end Amazon's common, uniform, unfair, and discriminatory policies and practices.

107.   Predominance and Superiority (Rule 23(b)(3) only).  Class certification under Rule 23(b)(3) is also appropriate because common questions of fact and law predominate over questions affecting only individual Class Members, and because a class action is superior to

FIRST AMENDED CLASS ACTION COMPLAINT  Page 20

other available methods for the fair and efficient adjudication of this litigation. The Class Members have been damaged and are entitled to recovery as a result of Amazon's common, uniform, unfair, and discriminatory policies and practices. Calculation of damages based on Amazon's computerized data will be more efficiently performed on a class-wide than an individual-by-individual basis. The propriety and amount of punitive damages will be based on Amazon's conduct, making these issues common to the Class.

## VII.   PLAINTIFFS' INDIVIDUAL FACTUAL ALLEGATIONS

### A.   Plaintiff Cisneroz's Factual Allegations

108.   Plaintiff Cisneroz's experiences, detailed below, both (a) illustrate Amazon's unlawful treatment in determining the terms and conditions of employment, including setting compensation and determining Job Codes, and (b) support her individual EPA and EPOA claims.

109.   Plaintiff Cisneroz reincorporates by reference Paragraph 1 through 107 above, all of which inform her understanding of how her and her comparators' job duties, compensation, and career advancement.

#### 1.   Background

110.   A. Cisneroz is an accomplished professional with over 15 years of experience working in product management at major corporations.

111.   She holds a bachelor's of business administration degree in finance from Northeastern State University.

#### 2.   Amazon Paid Plaintiff Cisneroz Less Than Her Male Comparators Who Performed Substantially Similar Work.

112.   In May 2022, Plaintiff Cisneroz joined Amazon as an L7 Principal Product Manager in its Fashion and Personalization organization. At the time, Amazon paid Plaintiff Cisneroz a salary of approximately $205,000. Amazon also awarded her a sign-on bonus that was paid out in monthly increments over a two-year period, in addition to an equity award that

FIRST AMENDED CLASS ACTION COMPLAINT  Page 21

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

vested over time.

113.    Amazon hired Plaintiff Cisneroz as a non-"tech"-classified Principal Product Manager.  After Plaintiff Cisneroz started at the company, she learned that Amazon also has a "tech"-classified L7 Principal Product Manager job code.

114.    Through conversations with her colleagues, Plaintiff Cisneroz learned that Amazon pays "tech"-classified Principal Product Managers more than non-"tech" Principal Product Managers (like herself), even though she observed that they performed the same or similar job duties and possessed comparable qualifications.

115.    For example, Plaintiff Cisneroz regularly observed that J.P., a Seattle-based employee on her team, performed substantially similar work to her, including creating product roadmaps, generating and implementing new projects, working with other teams to ensure increased use of their products, and planning and designating workflows for the product teams. Plaintiff Cisneroz understands J.P. holds similar credentials as her as well.  Despite this, Amazon classified J.P.'s role as an L7 Principal Product Manager-Tech.

116.    In or around October 2022, J.P. took a sabbatical from Amazon.  Plaintiff Cisneroz was instructed to take over all of J.P.'s projects and job duties while he was on leave, including the gaming platform product which J.P. managed.  Plaintiff Cisneroz managed all of J.P.'s projects and job duties for the remainder of her tenure at Amazon.  Amazon did not hire anyone to replace J.P., and when he returned to Amazon after his sabbatical, he did not return to his prior role.  Running J.P.'s projects did not require any new or different responsibilities or skills compared to Plaintiff's projects—after taking over all of J.P.'s duties and projects, Plaintiff Cisneroz's day-to-day work still remained the same, just with the addition of J.P.'s former products related to Amazon's gaming platforms.

117.    Despite always performing similar work as J.P., and for most of her tenure at

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

Amazon, performing *all* of his job duties and responsibilities, Amazon at all times kept Plaintiff Cisneroz in a non-"tech" position. As a result, Plaintiff Cisneroz understands that she was paid less than J.P.

118. Plaintiff Cisneroz understands that other men who had similar job duties and responsibilities as herself and J.P also received the "tech" designation. For example, A.M. was an L7 Principal Product Manager-Tech. A.M. had similar responsibilities to Plaintiff Cisneroz, including identifying and implementing new projects and creating product roadmaps. A.M. did not have responsibility for a specific product, unlike Plaintiff Cisneroz – meaning he had fewer responsibilities than Plaintiff Cisneroz. Despite that, Plaintiff Cisneroz understands that, because he was "tech" classified, Amazon paid A.M. more than her.

119. Based on her observations of J.P. and A.M., as well as her understanding of how Amazon's Level and Role Guidelines apply to Principal Product Managers, Plaintiff Cisneroz understands and believes there are additional men beyond J.P. and A.M. as well who had similar job duties as her but were paid more.

120. Because Plaintiff Cisneroz did not have a "tech" title, even though she performed "tech" work, Plaintiff Cisneroz found that in meetings with developers and software engineers, she was taken less seriously and treated worse than men with the same job title and responsibilities as her but who had received the "tech" designation.

121. Plaintiff Cisneroz believes the lack of the "tech" designation thus hindered her career advancement opportunities at Amazon, including her opportunities for promotion.

122. As a result of Amazon's Compensation Practices, including not classifying Plaintiff Cisneroz's role as "tech," and Amazon's denial of career advancement opportunities, Plaintiff Cisneroz understands and believes that her total compensation was substantially less than that of men performing similar work, such as J.P. and A.M. Plaintiff Cisneroz further

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

expects and believes that, under Amazon's job classification system, there are additional men performing similar work and receiving higher pay outside of her job family and job level.

123. Amazon terminated Plaintiff Cisneroz's employment in October 2024 without ever correcting the gender-based pay disparity.

**B.    Plaintiff Srinivas's Factual Allegations**

124. Plaintiff Srinivas's experiences, detailed below, both (a) illustrate Amazon's unlawful treatment in determining the terms and conditions of employment, including setting compensation and determining Job Codes, and (b) support her individual EPA and EPOA claims.

125. Plaintiff Srinivas reincorporates by reference Paragraph 1 through 107 above, all of which inform her understanding of her and her comparators' job duties, compensation, and career advancement.

### 1.    Background

126. Gayatri Srinivas is an accomplished professional with over 20 years of experience working as a technical writer at tech companies.

127. She holds a bachelor's degree in English literature from University of Rajasthan and a certificate in communications from Bellevue Community College.

### 2.    Amazon Paid Plaintiff Srinivas Less Than Her Male Comparators Who Performed Substantially Similar Work.

128. In 2011, Plaintiff Srinivas joined Amazon as an L5 Technical Writer II in Amazon Web Services ("AWS"). When Plaintiff Srinivas joined Amazon, she was one of just 12 technical writers in AWS. By the time she departed, Amazon employed over 350 technical writers. Plaintiff Srinivas was the longest-tenured technical writer in the company, and as a result of that, brought a wealth of experience, skill, knowledge, and expertise to her role.

129. Owing to her uniquely long tenure with the company, Plaintiff Srinivas's managers routinely assigned her the most complicated and technically demanding projects.

FIRST AMENDED CLASS ACTION COMPLAINT Page 24

130.    At the time she was hired, Amazon paid Plaintiff Srinivas a salary of approximately $91,000.  Although "technical" appears in the title, Plaintiff. Srinivas's role was not classified as "tech" by Amazon.

131.    In 2015, Plaintiff Srinivas moved to the Distributed Computing Platform team, housed within Amazon.com Services.  Her compensation and job duties, however, did not change.

132.    In 2016, Plaintiff Srinivas was promoted to an L6 Senior Technical Writer.

133.    In or around 2020, Plaintiff Srinivas's colleagues advocated for management to classify their role as "tech," because they performed technical work and the "tech" classification came with higher compensation and clearer promotion paths.  Around this time, Amazon re-classified Plaintiff Srinivas's job as "tech," but her job duties did not change in any way.

134.    In or around 2021, Plaintiff Srinivas moved back to a team within AWS.  Her job duties, however, did not change as a result of the move.  Ms. Srinivas remained in this role until she departed Amazon.

135.    Throughout her early career, Plaintiff Srinivas believed her compensation was below industry standard, despite her long tenure on the team, extensive experience, and challenging projects.  In 2013 or 2014, Plaintiff Srinivas spoke with a male colleague who recently joined the company, held the same job title, and had the same core job responsibilities as she did, such as collaborating with other Amazon employees to write highly technical materials, including user guides, tutorials, and reference materials; managing the documentation lifecycle to keep content current and accurate; and designing and organizing content.  Her colleague informed her that his compensation met industry standard – despite the fact that he had shorter tenure.

136.    In or around 2022 or 2023, Plaintiff Srinivas's manager informed her that she

FIRST AMENDED CLASS ACTION COMPLAINT  Page 25

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

would be receiving a substantial salary increase because her salary was below the industry standard based on her level and experience. Amazon thus increased Plaintiff Srinivas's salary to approximately $160,000.

137. Plaintiff Srinivas understands from this conversation and her prior knowledge of her male colleague's compensation that she was being paid less than other male L6 Senior Technical Writers who performed the same work as her. Plaintiff Srinivas regularly worked with and spoke with other Senior Technical Writers, and knows that they all hold the same core job responsibilities, including designing, implementing, and updating written content for the company, as explained in further detail above. Plaintiff Srinivas also understands that, under Amazon's Level and Role Guidelines, people who hold the same job title and level as her hold the same core job responsibilities.

138. Further, even with that increase, throughout her tenure at Amazon, including up through her departure in March 2025, Plaintiff Srinivas understands that her salary and target compensation total never approached the higher end for the compensation band for employees in her job code, despite extensive experience and the complicated projects she handled at Amazon. And after Amazon increased her salary, Plaintiff Srinivas's annual equity grants sharply decreased. As a result, her increase in total compensation was not as significant as the increase in salary. Plaintiff Srinivas thus continued to be underpaid.

139. Upon information and belief, Amazon paid male employees performing similar work, including in the same job code and other similar job codes (such as Senior Content Strategists within AWS, a role that previously was encompassed by the Senior Technical Writer role, and was split into two separate roles in 2023), more than Plaintiff Srinivas, including during the time period relevant to this case. Based on Amazon's Level and Role Guidelines, as well as her 14 years of working at Amazon as a Technical Writer, Plaintiff Srinivas knows that the roles

FIRST AMENDED CLASS ACTION COMPLAINT Page 26

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

within the same job code and these related job codes were similar and had similar responsibilities, including planning, creating, and implementing content. As a result of Amazon's Compensation Practices, while Plaintiff Srinivas lacks information to provide their specific names, Plaintiff Srinivas understands and believes that her total compensation was substantially less than that of men performing similar work throughout her entire tenure at Amazon.

### 3. Amazon Limited Plaintiff Srinivas's Career Advancement Opportunities.

140. Plaintiff Srinivas was an L6 Senior Technical Writer for almost nine years. Throughout that time, she routinely sought promotion to an L7. Despite being highly qualified for the L7 role, Amazon did not promote her. During Plaintiff Srinivas's tenure, she observed few people be promoted to L7 in her role.

141. Recognizing the challenges of receiving a promotion from the Senior Technical Writer role, Plaintiff Srinivas sought to move to other roles within her organization, such as Content Strategist. Until 2023, Technical Writers and Content Strategists were one role; in 2023, Amazon divided them into two positions. However, Ms. Srinivas observed that Content Strategists had a clearer promotion path than Technical Writers.

142. Multiple times after returning to AWS in 2021, Plaintiff Srinivas attempted to move to the Content Strategy team. However, Amazon never permitted or supported her transfer. Plaintiff Srinivas observed that male Technical Writers more easily transitioned to Content Strategy and were ultimately promoted to L7 roles. For example, Plaintiff Srinivas's colleague, Josh Bean, moved to the Content Strategy team and was promoted to an L7. Mr. Bean had shorter tenure at Amazon than Ms. Srinivas, was not more qualified than her, and based on her observations, as Technical Writers, they had the same job responsibilities (including managing the documentation lifecycle at Amazon, writing guides and reference

FIRST AMENDED CLASS ACTION COMPLAINT Page 27

materials, and working closely with employees from other teams to create written content). Plaintiff Srinivas understands and believes that other men similarly had the opportunity to more easily transfer teams and advance in the company.

143.    Plaintiff Srinivas left Amazon in March 2025 as an L6 Senior Technical Writer. Prior to her departure, Amazon never fully corrected the gender-based pay disparity that existed throughout her tenure at the company.

### C.    Plaintiff Taylor's Factual Allegations

144.    Plaintiff Taylor's experiences, detailed below, both (a) illustrate Amazon's unlawful treatment in determining the terms and conditions of employment, including setting compensation and determining Job Codes, and (b) support her individual EPA, California EPA, and FEHA claims.

145.    Plaintiff Taylor reincorporates by reference Paragraph 1 through 107 above, all of which inform her understanding of her and her comparators' job duties, compensation, and career advancement

### 1.    Background

146.    Terisha Taylor is an accomplished professional with almost 15 years of experience working in corporate operations at large companies.

147.    She holds a bachelor's degree in Sociology from the University of San Diego and is presently pursuing a Master of Business Administration in Global Leadership from the Jack Welch Management Institute.

### 2.    Amazon Paid Plaintiff Taylor Less Than Her Male Comparators Who Performed Substantially Similar Work.

148.    In January 2018, Plaintiff Taylor joined Amazon as an L5 Area Manager in its Operations organization.  At the time, Amazon paid Plaintiff Taylor a salary of approximately $80,000.  Although Plaintiff Taylor attempted to negotiate her salary around the time of her hire

FIRST AMENDED CLASS ACTION COMPLAINT Page 28

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

to reflect her years of corporate operations experience, Amazon refused to increase her salary, instead providing her with a few extra vacation days.

149.    In her L5 Area Manager role, Plaintiff Taylor worked at an Amazon warehouse facility and her job duties included oversight of associate employees who completed inbound "stowing" tasks of product into bins.  She facilitated "standup" meetings with her team and regularly checked on their work stations to ensure smooth performance.  Plaintiff Taylor's position also involved process improvement management, in which she observed opportunities to improve her "inbound" team's processes and proposed and implemented solutions.

150.    Through conversations with her colleagues, Plaintiff Taylor learned that Amazon paid her male L5 Area Manager colleagues more than her, even though they performed the same or similar job duties and possessed equal or fewer qualifications.  For example, Plaintiff Taylor is informed and believes that Amazon paid her colleagues Trent Bills, Michael Osterling, Ali Cheema, and Waleed Cheema—all L5 Area Managers in California performing the same responsibilities as Plaintiff Taylor when she held that role—a greater salary than it paid her. Like Plaintiff Taylor, these male colleagues oversaw employees completing "inbound" and "outbound" tasks at Amazon's warehouses and sought opportunities to improve their processes. Plaintiff Taylor is informed and believes that Amazon paid Trent Bills more than $80,000 in salary, paid Michael Osterling and Ali Cheema approximately $90,000 in salary, and paid Waleed Cheema approximately $100,000 in salary.

151.    In or around early 2019, Plaintiff Taylor believed, based on Amazon's written employment policies, that she qualified for a salary raise, as she had worked there for over one year.  She expressed this belief to her supervisor in around March 2019, who responded that Plaintiff Taylor did not qualify for the raise because she had not yet worked for Amazon for a sufficient period of time.

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

152. Plaintiff Taylor inquired about a pay raise again in or around March 2020. This time Plaintiff Taylor's supervisor explained that Plaintiff Taylor could not receive a raise due to on-site safety issues. However, this reasoning is belied by Plaintiff Taylor's consistently strong record as managing one of the top-ranked teams for both safety and performance.

153. Additionally, through conversations with her colleagues around the same time, Plaintiff Taylor learned that some men who were L5 Area Managers in California received raises, including her peer Art Garcia.

154. Around the late summer or autumn of 2020, Plaintiff Taylor transferred teams to join the Launch team as a Launch Manager, remaining an L5 at the same salary.

155. Around the autumn of 2021, Amazon promoted Plaintiff Taylor to an L6 Launch Senior Manager. In this role, Plaintiff Taylor's job duties included overseeing new Amazon warehouses to make sure they were completed correctly and prepared for use. She developed detailed project plans with timelines and milestones for various team members, traveled frequently to warehouses, walked the buildings with construction workers to review project plans and progress, sought to reduce operational costs by identifying and eliminating redundancies in the launch process, ensured fencing lines were accurate and safe for Amazon's operations team, acted as the point of contact to facilitate resolution of outstanding issues, made sure that completed projects were tested and prepared for use, and conducted post-launch evaluations to identify issues for improvement.

156. When Amazon promoted Plaintiff Taylor to the L6 position it increased her salary to about $115,000.

157. During her employment, including when she was in the L6 position, Plaintiff Taylor was heavily involved with the company's diversity, equity and inclusion initiatives, including the Global Engineering Systems Diversity Equity and Inclusion programming ("GES-

FIRST AMENDED CLASS ACTION COMPLAINT Page 30

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

DEI"). As part of her involvement with GES-DEI, Plaintiff Taylor had numerous conversations with other people in her organization about issues including discrimination and compensation. Through those conversations, Ms. Taylor learned that Amazon paid her male Launch team colleagues more than her even though they performed the same or similar job duties (as explained herein) and possessed equal or fewer qualifications.

158. Because of her involvement with GES-DEI, Plaintiff Taylor also had access to an Amazon employee Slack communications channel designed to discover pay inequities, where Amazon employees would list their title, level, tenure, duties, and compensation. Postings on the Slack channel confirmed further to Plaintiff Taylor that Amazon hired her male L6 Launch team colleagues at higher compensation levels than her even though they performed the same or similar job duties and possessed equal or fewer qualifications. On information and belief, these individuals shared Plaintiff Taylor's job family and title.

159. Like Plaintiff Taylor, the work duties of these L6 Launch team comparators included travel to Amazon's warehouses to facilitate the completion of construction projects and prepare the warehouses for use. And like Plaintiff Taylor, these male L6 comparators developed project timelines and milestones for team members, engaged with construction teams to review project plans and progress, identified and eliminated redundancies in the launch process to reduce operational costs, ensured the accuracy and safety of fencing lines for the operations team, acted as the point of contact to resolve outstanding issues, facilitated testing and preparation of completed projects, and conducted post-launch evaluations to identify opportunities for improvement.

160. Due to the anonymous nature of the employee information posted on the Slack channel, Plaintiff Taylor lacks information as to the specific names of her male L6 comparators who earned greater compensation than her despite similar duties.

FIRST AMENDED CLASS ACTION COMPLAINT Page 31

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

161.   Plaintiff Taylor checked the Slack channel throughout her entire time as an L6 employee, which confirmed for her that, throughout the entirety of her employment, including the time period relevant to her claims in this case, Amazon continued to pay men with similar job duties and qualifications more than her.

162.   Amazon terminated Plaintiff Taylor's employment in March 2025 without ever correcting the gender-based pay disparity.

### D.   Plaintiff Sharp's Factual Allegations

163.   Plaintiff Sharp's experiences, detailed below, both (a) illustrate Amazon's unlawful treatment in determining the terms and conditions of employment, including setting compensation and determining Job Codes, and (b) support her individual EPA, California EPA, and FEHA claims.

164.   Plaintiff Sharp reincorporates by reference Paragraph 1 through 107 above, all of which inform her understanding of her and her comparators' job duties, compensation, and career advancement.

### 1.   Background

165.   Melissa Sharp is an accomplished professional with over 16 years of experience working in corporate training and staff development at large companies.

166.   Plaintiff Sharp earned a Bachelor of Science in Business Administration and Organizational Development from Colorado Technical University.

### 2.   Amazon Paid Plaintiff Sharp Less Than Her Male Comparators Who Performed Substantially Similar Work.

167.   In September 2022, Plaintiff joined Amazon as an L5 Curriculum Developer in its AWS organization.  At the time, Amazon paid Plaintiff Sharp a salary of approximately $107,000, with a signing bonus of about $27,000.  Her offer letter also specified an equity award of 575 Restricted Stock United that vested over four years, and an additional $21,000 bonus

FIRST AMENDED CLASS ACTION COMPLAINT Page 32

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

that she would receive following one year of employment.

168. Amazon coded Plaintiff Sharp's job as a "non-tech" position.

169. Plaintiff Sharp's duties involved developing curricula and implementing training to improve the capabilities of AWS Technical Account Managers. She also engaged with AWS stakeholders to evaluate the corporate learning needs of AWS Technical Account Managers, including gaps in existing training materials, to inform curriculum development.

170. In or around 2023, Plaintiff Sharp learned from her coworker, Ida Hunter, that Amazon paid employees more than her who had the same or substantially similar job duties and responsibilities as Plaintiff Sharp, but had "tech-coded" positions.

171. For example, on information and belief, Keishown Ireland, along with individuals on his team, were L5 Technical Curriculum Development Program Managers or Technical Curriculum Developers, and performed substantially similar duties to Plaintiff Sharp, despite having tech-coded positions. Like Plaintiff Sharp, among other similar duties and responsibilities, Mr. Ireland met with stakeholders to discern corporate learning needs and then created curricula to address those needs. Reflective of the substantial similarities between their roles, Plaintiff Sharp and Mr. Ireland relied on the same materials and information for their work.

172. Although Plaintiff Sharp understands that Mr. Ireland performed similar duties to her, Amazon paid Mr. Ireland more than her, which Plaintiff Sharp confirmed after researching Amazon's pay ranges for tech-coded Curriculum Developers on Amazon's "A to Z" platform.

173. Plaintiff Sharp understands that there are other male "tech"-coded Curriculum Developers she cannot specifically identify and, based on her understanding of Amazon's leveling and role guidelines, that they perform similar work to her (as outlined in more detail above), but are compensated more due to the "tech" label.

174. In or around late 2023 or early 2024, Plaintiff Sharp asked her new supervisor,

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

Caleb Stelle, about pathways to an L6 promotion. He was supportive, but expressed that there was not an opportunity to be promoted on her team.

175. Amazon later promoted Joshua Sargent, a man hired after Plaintiff Sharp into the same job title and job family, to an L6 position, in which he earned more compensation than Plaintiff Sharp and was given greater career advancement opportunity. However, Mr. Sargent performed the same duties as Plaintiff Sharp.

176. Amazon did not correct the gender-based pay disparity, and Plaintiff Sharp resigned from her employment in February 2025.

### E. Plaintiff Cordova's Factual Allegations

177. Plaintiff Cordova's experiences, detailed below, both (a) illustrate Amazon's unlawful treatment of women in determining the terms and conditions of employment, including in setting compensation and determining Job Codes, and (b) support her Individual Claims.

178. Plaintiff Cordova reincorporates by reference Paragraph 1 through 107 above, all of which inform her understanding of her and her comparators' job duties, compensation, and career advancement.

#### 1. Background

179. Ms. Cordova holds a Bachelor of Science degree and has 15 plus years of experience working in product and partnership management, business operations, and strategy.

180. In November 2018, Ms. Cordova interviewed for an L6 Program Manager position. Despite meeting all qualifications for the role, Amazon hired her as an L5 Program Manager.

181. Ms. Cordova excelled in this customer-facing role, managing business development with employers across AWS Academy.

FIRST AMENDED CLASS ACTION COMPLAINT Page 34

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

### 2. Amazon Discriminated Against Ms. Cordova By Delaying Her L6 Promotion Because of Her Pregnancy and Parental Leave.

182. Ms. Cordova became pregnant in June 2019, and was out on parental leave from January 2020 to July 22, 2020.

183. In August 2020, just after Ms. Cordova returned from parental leave, her manager, Louise Heppell, told her that she wanted to promote Ms. Cordova as quickly as possible. The next month, however, Ms. Heppell told Ms. Cordova Amazon's policy is not to promote anyone for at least six months after taking maternity leave.

184. In October 2020, Ms. Cordova filed a discrimination complaint with Amazon's ethics team, and Ms. Heppell received coaching as a result.

185. Despite continued high performance and taking on management of a small team in April 2021, Amazon did not promote Ms. Cordova to L6 until July 2021.

### 3. Amazon Failed to Update Ms. Cordova's Job Code/Family and Pay Her for the Role She Actually Performed.

186. In November 2019, Ms. Cordova transitioned from her customer-facing role into an internal operations lead. She asked her manager at the time if she was in the correct Job Family given the change in her role and responsibilities, but was advised that changing Job Families (from Program Management to Product Management) could hurt her career growth at Amazon.

187. Although Ms. Cordova began managing a team of at least three direct reports in April 2021, Amazon did not update her Job Code to reflect her managerial status. Instead, Ms. Cordova had to wait until November 2021, six months after she began managing a team, and four months after her promotion to L6, before Amazon changed Ms. Cordova's job code to L6 Manager III, Program Management. Even then, Amazon failed to update her Job Family.

188. In July 2022, Ms. Cordova took over her then-manager's role leading the AWS Employer Engagement team, and—after she had been in the incorrect Job Family since

FIRST AMENDED CLASS ACTION COMPLAINT Page 35

November 2019—Amazon finally changed her Job Family to an L6 Manager, Product Management.

189.    Amazon's failure to correct Ms. Cordova's Job Code and Job Family during this period resulted in Amazon paying her significantly less than she should have earned.

**4.    Since At Least 2023, Amazon Has Paid Ms. Cordova Less than Her Peers in Tech-Labeled Job Codes and/or L7 Roles Performing Substantially Similar Work.**

190.    In July 2023, Ms. Cordova began a new role, overseeing three new technical products, in addition to her other duties managing employees in tech-labeled positions.

191.    Ms. Cordova's higher-paid male colleagues, including Jimmy Coyne and Gerard Mannarino, were both L6s in July 2023, but Amazon paid them more than Ms. Cordova because, despite them performing substantially similar work to her, they were in tech-labeled positions.

192.    Amazon's failure to properly code Ms. Cordova's position has resulted in Amazon underpaying her by hundreds of thousands of dollars annually.

193.    When Ms. Cordova asked her new manager, Mariana Holliday, if Amazon could move her into a tech-labeled Job Code, Ms. Holliday instead put her up for L7 promotion in January.  Ms. Holliday recognized the work Ms. Cordova was performing as an L6 was substantially similar to the work performed by her higher-paid male L7 colleagues, including Tejas Vashi and Erik Kurtz.  Amazon, however, did not approve Ms. Cordova's promotion and continued to pay Ms. Cordova as an L6.

194.    After this promotion fell through, Ms. Cordova met one-on-one with Director Kevin Kelly in February 2024, who similarly acknowledged that Ms. Cordova was operating as an L7 and had the scope of an L7.

195.    Ms. Cordova continued to push for a Job Family change.  In March 2024, Ms. Cordova again asked her manager to move her to the Product Management - Tech Job Family to

FIRST AMENDED CLASS ACTION COMPLAINT  Page 36

reflect the role she had been performing for the last nine months.

196.    Although a tech assessment was completed in April 2024 to support Ms. Cordova's Job Code/Job Family change, it was not pushed through until August 2024.

197.    Even when Amazon finally updated her Job Code in August 2024, Amazon placed Ms. Cordova at the bottom of the pay range for this Job Code.

198.    Amazon has continued to underpay Ms. Cordova after she brought the pay disparity to Amazon's attention.  Amazon's knowledge of the pay disparity and failure to remedy it was willful.

### 5.    Amazon Subjected Ms. Cordova to Inferior Treatment Based on Her Gender.

199.    In September 2023, Amazon appointed Russell Cowley as Head of AWS Education Programs, and he began treating Ms. Cordova and other women worse than men.

200.    Mr. Cowley frequently commented on women's appearances, including Ms. Cordova's.  Mr. Cowley's comments made Ms. Cordova feel uncomfortable, and she reported this to Ms. Holliday.

201.    In addition to his inappropriate comments, Mr. Cowley passed over women for growth opportunities while giving those opportunities to men.  For example, in April 2024, Amazon implemented a reduction-in-force ("RIF") across AWS Training & Certification that disproportionately impacted women, including the teams led by Ms. Cordova, Ms. Holliday, and Jess Gilmore.

202.    In May 2024, the AWS Education Programs group was reorganized ("re-org").  Once again, the teams impacted the most were led by women, while most men reporting to Mr. Cowley, including Mr. Kurtz, did not have their teams impacted.

203.    As part of the re-org, in June 2024, Ms. Cordova began reporting directly to Mr. Cowley and overseeing the product management of all AWS Education Programs.

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

**6.    Ms. Cordova Complained About Gender Discrimination to Amazon.**

204.    By June 2024, Amazon still had not changed Ms. Cordova's Job Code or promoted her to an L7 role.  On or around June 14, 2024, Ms. Cordova explained to Mr. Cowley that she had been trying to change her Job Family to a technical Job Code for the past year.  In the same conversation, Mr. Cowley and Ms. Cordova discussed the scope of an L7 role.  Mr. Cowley was aware Ms. Cordova's promotion process did not go through and acknowledged that the scope of her role would continue to align her for an L7 promotion in future cycles.

205.    In response to how Mr. Cowley handled the April 2024 RIF and May 2024 re-org, in July 2024, one of Ms. Cordova's female peers, who also reported directly to Mr. Cowley, Ms. Gilmore, requested an ethics investigation into Mr. Cowley's treatment of women.  Ms. Gilmore identified both Ms. Cordova and Ms. Holliday as witnesses.

206.    On or around July 10, 2024, Ms. Cordova met with an Ethics Investigator who asked if she thought Mr. Cowley treated women in his organization differently than men.  Ms. Cordova responded yes, and provided multiple examples of Mr. Cowley's discriminatory behavior towards women, including placing women in Job Codes that did not reflect their work, and demoting one of Ms. Cordova's female direct reports while she was on maternity leave and transferring her team to a substantially less qualified male employee.

207.    Upon information and belief, Mr. Cowley knew Ms. Cordova participated in the ethics investigation and was informed of the investigation results in late July.

208.    Amazon is liable for Mr. Cowley's disparate treatment of Ms. Cordova because she (and others) complained to their managers and HR, but Amazon failed to take reasonably prompt and adequate corrective action.

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

**7.      Amazon Retaliated Against Ms. Cordova By Demoting Her and Removing Her Managerial Responsibilities.**

209.    Shortly after the investigation, Mr. Cowley began treating Ms. Cordova worse and took repeated steps to block her L7 promotion, which had been in progress since 2023.

210.    On August 1, 2024, Mr. Cowley criticized Ms. Cordova's handling of an incident involving one of her subordinates, despite Ms. Cordova following protocol by contacting HR. Ms. Cordova contacted the Ethics Investigator to document the potential retaliation.

211.    Two days later, on or around August 3, 2024, Ms. Cordova asked Mr. Cowley about her Job Code change and Q3 promotion.  Although he had supported her promotion two months prior (before she had engaged in protected activity), for the first time, Mr. Cowley said there was no space for new L7s in AWS Education Programs.[9]

212.    In October 2024, while Amazon continued to pay Ms. Cordova as an L6, she took over the responsibilities of her male colleague, Jimmy Coyne, which involved managing another 29 employees and overseeing the entire AWS Education Programs Tech Team.  Amazon, however, placed Ms. Cordova in a lower-paying Job Code than Mr. Coyne, resulting in Amazon paying her less than him to perform the same job duties (and in fact Ms. Cordova was performing additional duties than Mr. Coyne, as she continued to oversee the Product Team).

213.    Amazon's failure to properly code Ms. Cordova's position also resulted in Amazon paying her less than many of the tech-labeled program managers and software engineers working under her, including Nikshep Kotha Nagendra and Carlos Corzo.

214.    In January 2025, Mr. Cowley told Ms. Cordova there was no capacity for L7s in the organization (despite hiring two in December 2024 and February 2025).[10]

---

[9]    Despite claiming there were too many L7s, Mr. Cowley hired two new L7s in December 2024 and in February 2025.

[10]    One of those new hires, a female L7, reported to concerns to HR earlier this year regarding Mr. Cowley's treatment of women, including both herself and other female direct

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

215. Mr. Cowley recruited Lori Wangsness to assist him with another reorganization. On January 15, 2025, Ms. Wangsness told Ms. Cordova that Mr. Cowley was planning to remove her team and demote her to an individual contributor role, and he "had something against [her]."

216. On February 19, 2025, Mr. Cowley told Ms. Cordova she would no longer be part of his leadership team, would report to someone below him, and would be an individual contributor. With these changes, Mr. Cowley effectively eliminated any path for Ms. Cordova to be promoted (a promotion that Amazon had been promising her since 2023). Mr. Cowley acknowledged that he expected Ms. Cordova would be upset and would support her in finding a new job.

217. Ms. Cowley also demoted Ms. Gilmore. Ms. Holliday, who knew she was being targeted for demotion, chose to move to another role outside of Mr. Cowley's organization. Mr. Cowley did not remove any men from his leadership team or demote them as part of this restructuring.

218. When Mr. Cowley emailed the organization to announce the changes, he explicitly noted Amazon was removing Ms. Cordova from her manager position and placing her in an individual contributor role.

219. Several coworkers reacted to Mr. Cowley's email by calling her and making comments along the line of "Russell did you dirty."

### 8. Amazon Continues to Discriminate and Retaliate Against Ms. Cordova After She Took FMLA Leave.

220. Amazon continues to isolate Ms. Cordova by removing her work responsibilities in an undefined individual contributor role.

---

reports.

FIRST AMENDED CLASS ACTION COMPLAINT Page 40

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

221.    Ms. Cordova took approved FMLA and short-term disability leave from April to July 2025.

222.    Ms. Cordova was eligible for FMLA leave at the time she availed herself of the leave, and the leave was properly approved under both Amazon policy and the applicable laws. Ms. Cordova took FMLA medical leave between April 2, 2025 and June 24, 2025.

223.    After returning from her FMLA leave, Ms. Cordova returned to an undefined job, with no opportunity, scope, or work to complete that aligned with her L6 level.

224.    On October 22, 2025, Amazon changed Ms. Cordova's Job Code from Manager, Product Management III - Tech to Product Manager III (non-"tech"-labeled), reducing her total compensation range to $224,000 - $299,000.  Upon information and belief, Mr. Cowley was involved in, and approved, this change.

225.    On November 12, 2025, Ms. Cordova sought to add her legal claims against Amazon to the related *Wilmuth* action via a proposed Second Amended Complaint.

226.    On January 12, 2026, Amazon notified Ms. Cordova it was changing her job code back to Product Manager III – Tech, and were backdating this change to December 16, 2025. There were no changes to Ms. Cordova's compensation at that time.

227.    Despite Amazon reversing course on Ms. Cordova's job code, however, during her annual compensation review in early 2026, Ms. Cordova's total compensation was decreased by $45,000.

228.    Upon information and belief, Ms. Cordova is now at the lowest end of the pay range for her job code and level at $299,000, with total compensation for her role ranging from $299,000 - $398,000.

229.    As of filing, Amazon has not corrected the above-described pay disparities or returned Ms. Cordova to her pre-FMLA role.  Amazon's actions were and are willful and

FIRST AMENDED CLASS ACTION COMPLAINT  Page 41

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

malicious.

230. Amazon's discrimination and retaliation was intended to cause, and did cause, Ms. Cordova emotional distress, anxiety, humiliation, and loss of enjoyment of life.

### F.   Plaintiff Walker's Factual Allegations

231. Plaintiff Walker's experiences, detailed below, both (a) illustrate Amazon's unlawful treatment in determining the terms and conditions of employment, including setting compensation and determining Job Codes, and (b) support her individual claims.

232. Plaintiff Walker reincorporates by reference Paragraph 1 through 107 above, all of which inform her understanding of her and her comparators' job duties, compensation, and career advancement.

### 1.   Background

233. Plaintiff Walker is an accomplished professional with a background in civil engineering and several engineering certifications.

234. She holds a bachelor's degree from the University of Tennessee, Nashville.

### 2.   Amazon Paid Plaintiff Walker Less Than Her Male Comparators Who Performed Substantially Similar Work.

235. Amazon hired Plaintiff Walker in January 2022 as an L5 Construction Manager. At the time, Plaintiff Walker understood that she had applied and interviewed for an L6 Senior Construction Manager position, which was consistent with her educational and professional background. Amazon did not inform Plaintiff Walker why it hired her at the L5 level.

236. Plaintiff Walker's duties as an L5 Construction Manager involved overseeing construction projects for Amazon involving various types of facilities. For example, she oversaw construction of infrastructure to support Amazon's use of electronic vehicles, and the implementation of HVAC projects at facilities that required commercial air conditioning units. She attended construction meetings in which she met with architects about project design or with

FIRST AMENDED CLASS ACTION COMPLAINT Page 42

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

engineers to discuss project updates. She also participated in internal meetings in which she communicated developments about the projects she oversaw. Though Plaintiff Walker's position was office-based, she visited job sites approximately once per month. During these site visits, Plaintiff Walker would walk the site to visually confirm construction progress, and assess the project using Amazon's checklist to ensure compliance with safety standards.

237. Amazon paid Plaintiff Walker a starting salary of $102,000 and a signing bonus of approximately $40,000. Her salary increased over time during her employment until it reached approximately $110,000.

238. Plaintiff Walker soon became aware that Amazon paid more compensation to men who performed the same duties as her. For example, Plaintiff Walker's male colleague in New York, Todd Plociniak, was an L6 Senior Construction Manager. Despite being at the L6 level, Mr. Plociniak was, like Plaintiff Walker, an individual contributor, not a people manager. Like Plaintiff Walker, Mr. Plociniak oversaw construction projects for Amazon, including attending construction meetings with architects and engineers, attending internal meetings to discuss project updates, and making office visits to evaluate progress and compliance issues.

239. Though they performed the same duties as Plaintiff Walker, Amazon paid Mr. Plociniak more than her, including during the time period relevant to this case. Plaintiff Walker is informed and believes from her review of Amazon's open job postings for L6 Senior Construction Manager roles, that those employees—including Mr. Plociniak—earned between $180,000 to $280,000 in total annual compensation.

240. Amazon also paid Plaintiff Walker less than male L5 Construction Managers in New York who held the same role and performed the same duties, as outlined above, by refusing to increase her compensation after she moved from Chicago to New York.

241. Specifically, in July 2024, Plaintiff Walker relocated from Illinois to New York.

FIRST AMENDED CLASS ACTION COMPLAINT  Page 43

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

Plaintiff Walker was aware at the time she moved that Amazon paid greater total compensation ranges for New York-based employees compared to those based in Chicago, because she regularly reviewed internal Amazon documents for job postings that reflected the compensation ranges. Within weeks after moving to New York from Chicago, Plaintiff Walker raised the issue of a geography-based pay adjustment to her then-direct supervisor, Christina Fenn and to a Human Resources representative. Both refused to increase her pay. As a result, Plaintiff Walker earned substantially less than even her male L5 Construction Manager colleagues (whose specific names are unknown to her), who on information and belief earned between approximately $130,000 to $140,000 annually. Based on Plaintiff Walker's personal observations of the assignments and responsibilities given to other L5 Construction Managers during team meetings, as well as her knowledge of the L5 Construction Manager role based on Amazon's level and role guidelines, Plaintiff Walker understands the other L5 Construction Managers have the same job duties as herself, as outlined in further detail above.

242.    Amazon also diminished Plaintiff Walker's compensation and limited her career advancement opportunities compared to her male colleagues by promoting them over her despite her similar or greater qualifications. For example, Amazon hired Brett Miller as an L5 Construction Manager after it hired Plaintiff Walker. In addition to her longer tenure, Plaintiff Walker also had superior qualifications—Mr. Miller did not have an undergraduate degree, whereas Plaintiff Walker has a degree in civil engineering and numerous engineering certifications. Amazon then promoted Mr. Miller to the L6 Senior Construction Manager role (and greater compensation) in around 2023, despite the fact that Mr. Miller does not have an undergraduate degree, which Plaintiff Walker understands is listed as a minimum job qualification. Amazon never promoted Plaintiff Walker to the L6 role, despite her superior qualifications.

FIRST AMENDED CLASS ACTION COMPLAINT Page 44

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

243.    Throughout her employment in New York, Amazon paid higher compensation to male employees performing substantially the same work as Plaintiff Walker, both within her level and in the level above her, and limited her career advancement opportunities compared to her male colleagues.

## VIII.    STANDING FOR INJUNCTIVE RELIEF

244.    Plaintiffs have standing to pursue injunctive relief.

245.    For tech workers in Washington, California and New York, Amazon dominates the labor market.  Amazon is one of the largest employers, and the largest technology company employer, in both states, based on the number of employees.

246.    Amazon regularly acquires an ownership interest in other technology companies. In doing so, Amazon sometimes imposes elements of its employee compensation policies and job classification system on these corporate affiliates.

247.    As a result, tech workers in Washington, California, and New York who do not presently work at Amazon have a substantial likelihood of becoming an Amazon employee or otherwise being subject to Amazon's compensation policies and job classification system in the future.

248.    Plaintiff Cisneroz remains interested in working for Amazon in the future.  If she learns of a job posting that suits her qualifications, she intends to apply for the position.

249.    Plaintiff Taylor is interested in working for Amazon again in the future, and she occasionally reviews Amazon's job postings.  As recently as late 2025, Plaintiff Taylor also considered communications from a recruiter about a potential role working with Amazon.

250.    Despite her prior resignation, Plaintiff Sharp is interested in working for Amazon again in the future.  She has reviewed numerous job postings from Amazon with the hope of identifying an open position that suits her qualifications.  If she does so, she intends to apply for

FIRST AMENDED CLASS ACTION COMPLAINT  Page 45

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

the position.

251.    Plaintiff Cordova currently works at Amazon.

252.    Despite her experiences at Amazon, Plaintiff Walker is interested in working for Amazon again in the future, should she become aware of an available position that suits her qualifications.

IX.    **CAUSES OF ACTION**

**FIRST CLAIM**

**VIOLATIONS OF WASHINGTON EQUAL PAY AND OPPORTUNITIES ACT, RCW 49.58.010 *et seq.***

**(On Behalf of Plaintiffs Srinivas and Cisneroz Individually and on Behalf of the Washington Class)**

253.    Plaintiffs Srivinas and Cisneroz and the Washington Class incorporate by reference paragraphs 1 through 252 above.

254.    This claim is brought by Plaintiffs Srinivas and Cisneroz on behalf of themselves and the Washington Class.

255.    Pursuant to the Washington Equal Pay and Opportunities Act, RCW 49.58 *et seq.*, it is unlawful for an employer to discriminate in any way by providing compensation based on gender.  Amazon has paid Plaintiffs Srinivas and Cisneroz and the Washington Class less than similar male employees for the performance of work requiring similar skill, effort, and responsibility, and performed under similar working conditions.

256.    As described extensively above, Amazon has also provided fewer and less favorable career advancement opportunities to Plaintiffs Srinivas and Cisneroz and the Washington Class than men due to their gender.

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

**SECOND CLAIM**

**VIOLATIONS OF CALIFORNIA EQUAL PAY ACT,
CAL. LAB. CODE §§ 1197.5, 1194.5**

**(On Behalf of Plaintiffs Taylor and Sharp Individually and on Behalf of the California Class)**

257.    Plaintiffs Taylor and Sharp and the California Class incorporate by reference paragraphs 1 through 256 above.

258.    This claim is brought by Plaintiffs Taylor and Sharp on behalf of themselves and the California Class.

259.    The California Equal Pay Act, Cal. Lab. Code §§ 1197.5, 1194.5, makes it unlawful for an employer to discriminate between employees on the basis of sex by paying wages to employees at a rate less than the rate paid to employees of the opposite sex for substantially similar work.

260.    Amazon discriminated against Plaintiffs Taylor and Sharp and the California Class in violation of the California EPA by paying them less than their male comparators who performed substantially similar work when viewed as a composite of skill, effort, and responsibility, and which was performed under similar working conditions.

**THIRD CLAIM**

**VIOLATIONS OF NEW YORK EQUAL PAY LAW, N.Y. LAB. LAW ART. 6, § 194**

**(on behalf of Plaintiffs Cordova and Walker Individually, and on Behalf of the New York Class)**

261.    Plaintiff Cordova, Plaintiff Walker, and the New York Class incorporate by reference paragraphs 1 through 260 above.

262.    This claim is brought by Plaintiffs Cordova and Walker on behalf of themselves and the New York Class.

263.    The New York EPL, N.Y. Lab. Law Art. 6, § 194, makes it unlawful for an employer to discriminate between employees on the basis of sex by paying wages to employees

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

at a rate less than the rate paid to employees of the opposite sex for substantially similar work.

264.    Defendant discriminated against Plaintiff Cordova, Plaintiff Walker, and the New York Class in violation of the New York EPL, N.Y. Lab. Law Art. 6, § 194, by paying them less than their male comparators who performed substantially similar work, when viewed as a composite of skill, effort, and responsibility, and which was performed under similar working conditions.

265.    Defendant's violation of the New York EPL, as described in this Complaint, was willful and intentional.  Defendant did not make a good faith effort to comply with the New York EPL with respect to its compensation of Plaintiff Cordova, Plaintiff Walker, and the New York Class.

266.    As a consequence of Defendant's unlawful acts, Plaintiff Cordova, Plaintiff Walker, and the New York Class have been deprived of compensation and are entitled to recovery of such amounts plus liquidated damages, pre-judgment and post-judgment interest, attorneys' fees, costs, and other compensation pursuant to N.Y. Lab. Law Art. 6, § 194.

## FOURTH CLAIM

### VIOLATIONS OF EQUAL PAY ACT, 29 U.S.C. § 206 *et seq.*
### (on behalf of Plaintiffs individually)

267.    Plaintiffs incorporate by reference paragraphs 1 through 266 above.

268.    This claim is brought by Plaintiffs on behalf of themselves.

269.    Defendant discriminated against Plaintiffs in violation of the EPA, 29 U.S.C. § 206 *et seq.*, by paying them less than men who performed equal work requiring equal skill, effort, and responsibility, and which was performed under similar working conditions.

270.    The EPA makes it unlawful for an employer to discriminate between employees on the basis of sex by paying wages to employees at a rate less than the rate paid to employees of the opposite sex for equal work.

FIRST AMENDED CLASS ACTION COMPLAINT Page 48

271. Amazon subjected Plaintiffs to discriminatory leveling and compensation policies that resulted in the underpayment of salary, bonuses, and equity awards to Plaintiffs in violation of the EPA.

272. Amazon caused and contributed to the underpayment of Plaintiffs relative to men who were performing substantially equal work.

273. As a result of Amazon's conduct, Plaintiffs suffered harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

274. The foregoing conduct, as alleged, constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a).

**FIFTH CLAIM**

**GENDER DISCRIMINATION IN VOLATION OF THE FEHA, CAL. GOV. CODE § 12940(a)**

**(on behalf of Plaintiffs Taylor and Sharp individually and on behalf of the New York Class)**

275. Plaintiffs Taylor and Sharp incorporate by reference paragraphs 1 through 274 above.

276. Defendant violated the FEHA by discriminating against Plaintiffs Taylor and Sharp in the terms and conditions of their employment, including but not limited to their compensation and equity awards, because of their gender.

277. As described extensively above, Defendant violated the FEHA by providing fewer and less favorable career advancement opportunities to Plaintiffs Taylor and Sharp and the California Class because of their gender.

FIRST AMENDED CLASS ACTION COMPLAINT  Page 49

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

## SIXTH CLAIM

### GENDER DISCRIMINATION IN VIOLATION OF THE NYCHRL, N.Y.C. ADMIN. CODE § 8-101 *et seq.*

### (on behalf of Plaintiffs Cordova and Walker individually and on behalf of the New York Class)

278.    Plaintiffs Cordova and Walker incorporate by reference paragraphs 1 through 277 above.

279.    Defendant violated the NYCHRL by discriminating against Plaintiffs Cordova and Walker in the terms and conditions of their employment, including but not limited to their compensation and equity awards, because of their gender.

280.    As described extensively above, Defendant violated the NYCHRL by providing fewer and less favorable career advancement opportunities to Plaintiffs Cordova and Walker and the New York Class because of their gender.

## SEVENTH CLAIM

### GENDER DISCRIMINATION IN VIOLATION OF THE NYSHRL, N.Y. EXEC. LAW § 296 et seq.

### (on behalf of Plaintiff Cordova and Walker individually and on behalf of the New York Class)

281.    Plaintiffs Cordova and Walker incorporate by reference paragraphs 1 through 280 above.

282.    Defendant violated the NYSHRL by discriminating against Plaintiffs Cordova and Walker in the terms and conditions of their employment, including but not limited to their compensation and equity awards, because of their gender.

283.    As described extensively above, Defendant violated the NYSHRL by providing fewer and less favorable career advancement opportunities to Plaintiffs Cordova and Walker and the New York Class because of their gender.

FIRST AMENDED CLASS ACTION COMPLAINT  Page 50

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

## EIGHTH CLAIM

### RETALIATION IN VIOLATION OF THE NYCHRL, N.Y.C. ADMIN. CODE § 8-101 et seq.

**(on behalf of Plaintiff Cordova individually)**

284.    Plaintiff Cordova incorporates by reference paragraphs 1 through 283 above.

285.    Plaintiff Cordova engaged in protected activities under the NYCHRL, including opposing discrimination pursuant to Section 8-107.

286.    Defendant violated the NYCHRL when it treated Plaintiff Cordova less well because she opposed discrimination.

287.    Plaintiff Cordova is entitled to damages including but not limited to past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

## NINTH CLAIM

### RETALIATION IN VIOLATION OF THE NYSHRL, N.Y. EXEC. LAW § 296 et seq.

**(on behalf of Plaintiff Cordova individually)**

288.    Plaintiff Cordova incorporates by reference paragraphs 1 through 287 above.

289.    Plaintiff Cordova engaged in protected activities under the NYSHRL, including opposing discrimination.

290.    Defendant violated the NYSHRL by taking adverse actions against Plaintiff Cordova because of her protected activities.

291.    Plaintiff Cordova is entitled to damages, including but not limited to past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

FIRST AMENDED CLASS ACTION COMPLAINT  Page 51

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

**TENTH CLAIM**

**FAMILY AND MEDICAL LEAVE VIOLATIONS, 29 C.F.R. § 825.214**

**(on behalf of Plaintiff Cordova individually)**

292.    Plaintiff Cordova incorporates by reference paragraphs 1 through 291 above.

293.    Plaintiff Cordova took FMLA leave between April 2, 2025 and June 24, 2025.

294.    Defendant failed to restore Plaintiff Cordova to the same or equivalent position upon her return from FMLA leave, and further discriminated and/or retaliated against her following her FMLA leave, in violation of 29 C.F.R. § 825.214, by demoting her to an undefined role in a non-"tech"-labeled Job Code that significantly reduced her total compensation.

## X.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendant and relief as follows:

    A.    Certification of the case as a class action on behalf of the proposed Washington Class, California Class, and New York Class;

    B.    Designation of Plaintiffs Srinivas and Cisneroz as representatives of the Washington Class, designation of Plaintiffs Taylor and Sharp as representatives of the California Class, designation of Plaintiffs Cordova and Walker as representatives of the New York Class, and designation of Plaintiffs' counsel of record as Class Counsel;

    C.    Trial by jury;

    D.    Back pay with prejudgment interest, in amounts to be determined at trial, and other relief necessary to make Plaintiffs and Class Members whole for past and future pecuniary losses resulting from the unlawful employment practices described;

    E.    Front pay, in amounts to be determined at trial, and other relief necessary to make Plaintiffs whole for pecuniary losses resulting from the unlawful

FIRST AMENDED CLASS ACTION COMPLAINT Page 52

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

employment practices described;

F.      Damages for any and all forms of emotional distress Plaintiff Cordova has experienced, including but not limited to humiliation, loss of enjoyment of life, pain and suffering, personal indignity, embarrassment, fear, sadness, anger, anxiety, and anguish, in amounts to be established at trial;

G.      Double damages or exemplary damages for EPOA violations pursuant to RCW 49.58.070;

H.      Three hundred percent damages for New York EPL violations pursuant to New York Labor Law § 198(1-a);

I.      Liquidated damages and punitive damages under all applicable statutes;

J.      Pre- and post- judgment interest to the extent authorized by law;

K.      Declaratory and injunctive relief;

L.      Any and all other actual damages, costs, and expenses;

M.      Service payments to the representatives of the Class;

N.      Reasonable attorney's fees and costs;

O.      Monetary relief for any adverse tax consequences of their awards; and,

P.      Any and all such other relief as the Court deems just and proper.

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

DATED this 18th day of June, 2026.

OUTTEN & GOLDEN LLP

By: */s/ Jahan C. Sagafi*
    Jahan C. Sagafi*
    Hannah C. Meropol*
    Sophia Jane Balkoski*
    1999 Harrison Street, Suite 1500
    Oakland, CA 94612
    San Francisco, CA 94111
    Telephone: (415) 638-8800
    jsagafi@outtengolden.com
    hmeropol@outtengolden.com
    jbalkoski@outtengolden.com

    Adam T. Klein*
    Cara E. Greene*
    Michael C. Danna*
    Zarka Shabir DSouza*
    685 3rd Ave 25th Floor
    New York, NY 10017
    Telephone: (212) 209-0675
    aklein@outtengolden.com
    cgreene@outtengolden.com
    mdanna@outtengolden.com
    zdsouza@outtengolden.com

    Jenny Yang*
    Jennifer Davidson*
    Jon Ostrowsky*
    1225 New York Ave NW, Suite 1200B
    Washington, DC 20005
    Telephone: (202) 918-5476
    jyang@outtengolden.com
    jdavison@outtengolden.com
    jostrowsky@outtengolden.com

FRANK FREED SUBIT & THOMAS LLP

    */s/ Michael C. Subit*
    Michael C. Subit, ESBA No. 29189
    705 Second Avenue, Suite 1200
    Seattle Washington 98104
    Telephone: (206) 682-6711
    msubit@frankfreed.com

EQUAL RIGHTS ADVOCATES

    Noreen Farrell*

FIRST AMENDED CLASS ACTION COMPLAINT  Page 54

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800

Catherine Bendor*
Cassidy Clark*
611 Mission St, 4th Floor
San Francisco, CA 94105
Mailing: 150 Sutter St, P.O. Box #87
San Francisco, CA 94104
Telephone: (415) 471-1470
nfarrell@equalrights.org
cbendor@equalrights.org
cclark@equalrights.org

BIBIYAN LAW GROUP, P.C.

Cassandra Lenning, WSBA No. 54336
1460 Westwood Blvd.
Los Angeles, CA 90024
Telephone: (310) 438-5555
clenning@tomorrowlaw.com

*Attorneys for Plaintiffs and the Putative
Class Members*

*admitted pro hac vice*

OUTTEN & GOLDEN LLP
1999 Harrison Street, Suite 1500
Oakland, CA 94612
(415) 638-8800